Erik A. Christiansen, USB #7372
Christina M. Jepson, USB #7301
Sarah Jenkins Dewey, USB #15640
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
EChristiansen@parsonsbehle.com
CJepson@parsonsbehle.com
SDewey@parsonsbehle.com
ecf@parsonsbehle.com

Gregg M. Formella (*pro hac vice*)
**GREGG M. FORMELLA JD**
300 State St.
P.O. Box 92141
Southlake, TX 76092
gregg.formella@gmail.com

*Attorneys for Defendant SkyWest InFlight Association*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| LORI CHAVEZ-DEREMER, Secretary of Labor, United States Department of Labor,<br><br>Plaintiff,<br><br>v.<br><br>SKYWEST INFLIGHT ASSOCIATION,<br><br>Defendant. | **ANSWER AND COUNTERCLAIMS**<br><br>Consol. Case No. 2:24-cv-492-DBB-DBP<br><br>(Case No. 2:25-cv-700-DBB)<br><br>Hon. David Barlow<br><br>Magistrate Judge: Hon. Dustin B. Pead |

Defendant SkyWest InFlight Association ("SIA") hereby answers the Complaint of Lori Chavez-DeRemer, Secretary of Labor, United States Department of Labor ("DOL" or the

"Secretary") originally filed on August 20, 2025, in Case No. 2:25-cv-700, and asserts counterclaims as follows.[1]

**NATURE OF THE ACTION[2]**

1. Plaintiff Secretary Lori Chavez-DeRemer files this action under Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. §§ 481-83, to invalidate the results of an election held by SkyWest InFlight Association (SIA), a local labor organization, from January 21-28, 2025 (the "January 2025 election"), for failure to comply with federal labor laws and regulations. The Secretary requests the court order a new election supervised by the Department of Labor (DOL) with new nominations for National President and National Secretary.

RESPONSE: SIA admits that the DOL filed this action citing these statutes, that SIA is a labor organization under the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 401–531, and that SIA held an election from January 21–28, 2025. SIA affirmatively alleges that it is also a labor organization operating nationally under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq.* SIA denies that it is a *local* labor organization and affirmatively alleges that it is a *national* labor organization under the LMRDA, and represents approximately 4,800 Flight Attendants who are regulated on a national basis by or on behalf of federal aviation safety and security agencies (*e.g.,* the Department of Transportation, the Federal Aviation Administration, and the Transportation Security Administration) and are based in some 20 cities

[1] On January 20, 2026, Case No. 2:25-cv-700 was consolidated with Case No. 2:24-cv-492. *See* ECF No. 83.

[2] The Complaint's headings are included here for organizational purposes only and shall not be interpreted as admitting anything not specifically admitted herein.

across the United States and serve on over 500 jet aircraft providing some 5000 flights daily—to and from 230 airports all over the country, as well as various locations in Canada and Mexico—for their employer, SkyWest Airlines ("SkyWest"), and SkyWest's customers, including Alaska Airlines, American Airlines, Delta Air Lines, and United Airlines. SIA denies that it failed to comply with federal labor laws and regulations and further denies that the DOL is entitled to any relief.[3]

2. After receiving complaints from SIA members, the DOL investigated and found that SIA violated Section 401(e) of the LMRDA, 29 U.S.C. § 481(e), by:

a. Failing to provide members a reasonable opportunity to nominate candidates for the January 2025 election and instead only permitting incumbent executive board members to nominate candidates;

b. Imposing the candidate eligibility requirement that a candidate for an Executive Leader office have either prior experience as a National Representative for SIA or demonstrated prior experience in a comparable leadership position within the last five calendar years; and

c. Denying a member due process by improperly disqualifying the member from being a candidate for National President where SIA did not provide proper notice of the charges and disqualification for an alleged breach of duty of loyalty.

[3] SIA hereby incorporates into each paragraph of this Answer all of the other paragraphs of this Answer as applicable.

RESPONSE: SIA lacks knowledge or information sufficient to respond as to the truth of the allegations of paragraph 2 except that SIA admits that it understands the DOL conducted some investigation and SIA denies that it has violated the LMRDA. SIA affirmatively alleges that a predicate to certain of DOL's compliance claims is a DOL allegation that SIA is not a "national" labor organization under the LMRDA but a "local" one—an inaccurate and incorrect determination the DOL reached without providing Due Process.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction over this action pursuant to 29 U.S.C. § 482(b), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

RESPONSE: SIA denies the allegations of paragraph 3 as the SIA members whose alleged "complaints" are the basis for DOL's action failed to exhaust SIA's internal appeal process, such that the DOL should not have acted upon their complaints. *See* 29 U.S.C. § 482(a) (in order for a member of a labor organization to file a complaint with DOL, the member must first have "exhausted the remedies available under the constitution and bylaws of such organization"); *see also* 29 U.S.C. § 482(b) (authorizing DOL to investigate a complaint only if the member in fact exhausted the labor organization's internal appeal process as required by 29 U.S.C. § 482(a)); *Wirtz v. Bottle Blowers Assn.*, 389 U.S. 463, 472 (1968).

4. This Court may exercise personal jurisdiction over SIA because SIA maintains its principal office in this district.

RESPONSE: SIA admits the allegations of paragraph 4.

5. Venue is proper in this district pursuant to 29 U.S.C. § 482(b); 28 U.S.C. § 1331; 28 U.S.C. § 1345; and 28 U.S.C. § 1391(b).

RESPONSE: SIA admits that venue is proper in this district under 29 U.S.C. § 482(b) and 28 U.S.C. § 1391(b) but denies the remaining allegations in this paragraph.

**PARTIES**

6. Plaintiff Lori Chavez-DeRemer is the Secretary of the United States Department of Labor. Acting through its Secretary, the Department of Labor is authorized to bring this action under the LMRDA, 29 U.S.C. § 482(b).

RESPONSE: SIA admits that Lori Chavez-DeRemer is the Secretary of Labor. This paragraph's remaining allegations consist of legal conclusions which require no response. To the extent a response is required, SIA denies those allegations.

7. SIA is, and at all times relevant to this action has been, an unincorporated association residing within, and maintaining its principal office in, Salt Lake County, Utah, within the jurisdiction of this district.

RESPONSE: SIA admits the allegations of paragraph 7.

**FACTUAL ALLEGATIONS**

8. SIA has existed as a labor organization since 1994.

RESPONSE: SIA admits that it is a labor organization under the LMRDA and that it has existed, and operated nationally as, as a labor organization under the RLA since at least 1994. SIA denies any remaining allegations of paragraph 8.

9. SIA is the only labor organization that represents SkyWest Airlines flight attendants. As such, it is the only authorized representative body SkyWest Airlines recognizes to speak and negotiate on behalf of SkyWest Airlines' flight attendants.

RESPONSE: SIA admits the allegations of paragraph 9. SIA affirmatively alleges that it represents SkyWest's Flight Attendants throughout the entirety of United States and is, by law, necessarily their exclusive representative, due to the fact the RLA, which governs labor relations in the airline industry, has been determined to allow for but a single labor organization to represent all the members of a given workgroup nationally.

10. SIA has approximately 4,600 members dispersed across the United States, Canada, Mexico, and the Bahamas.

RESPONSE: SIA admits that it has approximately 4,800 members and that its members work on flights across the United States, Canada, and Mexico. SIA denies that it currently has members based in the Bahamas or that any of its members currently work any flights to or from the Bahamas. SIA affirmatively alleges, however, that SkyWest has provided service to the Bahamas in the past and that SIA's members remain up to date on qualifications for service to the Bahamas. SIA affirmatively alleges that it has members who live across the world. SIA denies any remaining allegations of paragraph 10.

11. Any SkyWest flight attendant who is on the seniority list and has successfully completed an initial operating experience is a SIA member.

RESPONSE: SIA admits that it accepts and recognizes as a member any SkyWest Flight Attendant who satisfies these criteria to the extent consistent with SIA's Constitution and Bylaws.

12. SkyWest Airlines funds SIA's operations such that SIA's members pay no membership dues.

RESPONSE: SIA admits that no individual member is charged or assessed membership dues or fees and admits that, as a function of the collective bargaining agreement it has negotiated

with SkyWest, SkyWest is required to fund it. SIA denies that it receives or has received any unlawful payments or support from SkyWest. SIA affirmatively alleges that, on behalf of its Members, SIA properly engages in collective bargaining with SkyWest and administers and enforces a labor contract ("Flight Attendant Policy Manual" or "FAPM") by and between SIA and SkyWest that establishes the Flight Attendants' wages, hours, benefits, and other terms and conditions of employment including certain related expenses.

13. SIA describes itself as a national labor organization.

RESPONSE: SIA admits that it describes itself as a national labor organization and affirmatively alleges that it does so because SIA is a national labor organization under the LMRDA and operates nationally under the RLA.

**SIA is a Local Labor Organization under the LMRDA**[4]

14. SIA interacts with SkyWest Airlines management on behalf of its members to "mak[e] and maintain[] employment agreements covering rates of pay, rules, and working conditions for SIA Members." SkyWest Inflight Association Constitution and Bylaws, revised August 12, 2024 (the "Bylaws"), § 2.

RESPONSE: SIA admits the allegations of paragraph 14. SIA affirmatively alleges that this is only one of many activities SIA undertakes.

15. SIA is not and has never affiliated with subordinate or parent labor organizations; SIA is the organizational body closest to its membership.

[4] To the extent headings in the Complaint, such as this one and others, would purport to be allegations, they raise legal questions, make conclusory assertions of law, and/or set forth gratuitous argumentative characterizations to which no response is required. To the extent a response is required, SIA hereby denies such would-be allegations.

RESPONSE: SIA admits that it is, and that it has never been anything but, a unitary entity having no parent, affiliate, or subordinate labor organization(s). The allegation that SIA is "closest to its membership" is vague and insufficient for SIA to form an opinion regarding its meaning and accuracy and SIA therefore lacks knowledge or information sufficient to respond as to the truth of that allegation. SIA affirmatively alleges that: (a) the LMRDA does not use the terms "close," "closer," or "closest" in regard to any category of labor organization; and (b) DOL's reliance on its undefined concept of "closeness" of a labor organization to its membership is unwarranted and inappropriate.

16. SIA fulfills the following functions and purposes that are typical of local labor organizations:

a. Holding board meetings where official business is conducted and allowing SIA members to attend;

b. Disciplining SIA members and officers;

c. Negotiating collective bargaining agreements with SkyWest;

d. Negotiating the policies and procedures of SkyWest's Inflight Operations Department;

e. Entering into agreements with SkyWest that govern the terms and conditions of employment of SIA members;

f. Negotiating employee grievance, corrective action, and termination policies with SkyWest and representing SIA members in adverse employment actions against SkyWest;

g. Permitting SIA members to submit official grievances against SkyWest through SIA's website;

h. Reviewing aggrieved SIA members' files and discussing grievance issues with management;

i. Negotiating employee grievance policies wherein SIA considers the facts presented by the flight attendant, decides whether the grievance is valid, and discusses the grievance with SkyWest without the employee being present.

RESPONSE: SIA admits that it engages in the conduct listed in subparagraphs (a)–(i). As to the allegation that certain activities are typical of a local labor organization, paragraph 16 raises legal questions, is based on conclusory legal assertions, and requires no response. To the extent a response is required, SIA specifically denies that it is a "local" labor organization and that these are exclusively "local" functions. SIA affirmatively alleges that: (a) it exclusively represents SkyWest's Flight Attendants on a national basis; (b) the functions listed by the DOL in paragraph 16 are not exclusively performed by "local" labor organizations and are performed by many labor organizations that the DOL appropriately regards as "national" labor organizations; (c) while SIA engages in the functions listed in paragraph 16, it continuously engages in many and various functions that the DOL does not regard as "local" functions and instead regards as functions of "national" labor organizations. SIA otherwise denies the allegations of paragraph 16.

**SIA Did Not Notify Members of Nominations for the January 2025 Election**

17. SIA is governed by Executive Leaders (which include the National President, National Vice President, and National Secretary), and a National Representative Board (comprised

of at least seven Representatives). Collectively, SIA's Executive Leaders and National Representative Board are referred to as the "Executive Board."

RESPONSE: SIA admits the allegations of paragraph 17 except SIA denies that it refers to its Executive Leaders and National Representative Board as the "Executive Board." SIA affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board."[5]

18. SIA holds monthly Executive Board meetings at various locations, rotating through SIA's twenty domiciles across the United States.

RESPONSE: SIA admits the allegations of paragraph 18 except SIA denies that it refers to its Executive Leaders and National Representative Board as the "Executive Board." SIA affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board." SIA affirmatively alleges that meetings are also held at other locations across the United States.

19. The dates and locations of the monthly Executive Board meetings are posted on SIA's website.

RESPONSE: SIA admits the allegations of paragraph 19 except SIA denies that it refers to its Executive Leaders and National Representative Board as the "Executive Board." SIA

[5] The Complaint is vague and ambiguous with respect to whether the allegations in the last sentence of paragraph 17 are intended as an allegation of fact or are instead intended to provide a defined term for purposes of the Complaint (*i.e.,* that for purposes of this Complaint, the term "Executive Board" refers to SIA's Executive Leaders and National Representative Board). Out of an abundance of caution, SIA denies in this Answer and Counterclaims that its Executive Leaders and National Representative Board are referred to as the "Executive Board."

affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board."

20. SIA members have the right to attend Executive Board meetings if they notify the Executive Board five days prior to the meeting. While members may attend Executive Board Meetings, SIA members have no right to vote at those meetings and may only speak if they request time on the agenda.

RESPONSE: SIA denies that it refers to its Executive Leaders and National Representative Board as the "Executive Board." SIA admits that its members have the right to attend National Board meetings if they provide notice of their planned attendance to SIA's Executive Leadership and that members generally have no right to vote at those meetings but denies any remaining allegations of paragraph 20.

21. At all times relevant to this action, SIA was governed by the Bylaws.

RESPONSE: Paragraph 21 raises legal questions, is based on conclusory legal assertions, and requires no response. To the extent a response is required, SIA admits it has been governed by its Constitution and Bylaws, revised August 12, 2024, which the Complaint defines as the "Bylaws." SIA denies any remaining allegations of paragraph 21.

22. Section 16(C)(1) of the Bylaws provides,

> Any Member in good standing may self-nominate, nominate, or be nominated by another Member in good standing (see Section 9 Membership) for a National Board Representative position by filing a candidate intent form by the date and time specified to provide their notice of candidacy and be considered.

RESPONSE: SIA admits that this language appears in SIA's Constitution and Bylaws, revised August 12, 2024. SIA denies any remaining allegations of paragraph 22.

23. Section 16(C)(1)(b) of the Bylaws provides, "The Board shall announce to Members when nominations (candidate intent forms) will be accepted at least 60 days prior to the end of the term for National Board Representatives."

RESPONSE: SIA admits that this language appears in SIA's Constitution and Bylaws, revised August 12, 2024. SIA denies any remaining allegations of paragraph 23.

24. The Bylaws do not contain any provision regarding the method for nominating Executive Leader candidates or for notifying members of nominations for Executive Leadership positions.

RESPONSE: SIA denies the allegations of paragraph 24.

25. SIA held its October 2024 Executive Board meeting in Detroit, Michigan, where the Executive Board announced that nominations for the January 2025 election would take place at the November 2024 Executive Board meeting.

RESPONSE: SIA admits the allegations of paragraph 25 except SIA denies that it refers to its Executive Leaders and National Representative Board as the "Executive Board." SIA affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board."

26. No SIA members, other than the incumbent Executive Board officers, attended the October 2024 Executive Board meeting.

RESPONSE: SIA admits the allegations of paragraph 26 except SIA denies that it refers to its Executive Leaders and National Representative Board as the "Executive Board." SIA affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board."

27. SIA did not issue a notice of nominations for the January 2025 election to SIA members, nor did it use any other method reasonably calculated to inform all members that nominations for the January 2025 election would take place at the November 2024 Executive Board meeting.

RESPONSE: SIA denies the allegations of paragraph 27. In addition, SIA affirmatively alleges that SIA's members had actual and/or constructive knowledge about nominations for the January 2025 election. SIA further denies that it refers to its Executive Leaders and National Representative Board as the "Executive Board." SIA affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board."

28. SIA held its November 2024 Executive Board meeting in Palm Springs, California.

RESPONSE: SIA admits the allegations of paragraph 28 except SIA denies that it refers to its Executive Leaders and National Representative Board as the "Executive Board." SIA affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board."

29. Nominations for the January 2025 election were held at the November 2024 Executive Board meeting.

RESPONSE: SIA admits the allegations of paragraph 28 except SIA denies that it refers to its Executive Leaders and National Representative Board as the "Executive Board." SIA affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board."

30. As SIA expected, because it provided its members no notice of nominations, no SIA members, other than incumbent Executive Board officers, attended the Executive Board meeting.

RESPONSE: SIA denies that it refers to its Executive Leaders and National Representative Board as the "Executive Board." SIA affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board." SIA admits that its then-serving National Board members were the only attendees at the November 2024 National Board meeting but denies the remaining allegations of paragraph 30.

31. During the November 2025 Executive Board meeting:

a. Incumbent President Brent Coates nominated himself as a candidate for National President in the January 2025 election and accepted the nomination;

b. National Representative Don Spurgeon was nominated, and accepted his nomination, as a candidate for National President in the January 2025 election;

c. National Representative Kyle Bessone nominated himself as a candidate for National Secretary in the January 2025 election and accepted the nomination; and

d. Incumbent National Secretary Stacey Quinn nominated herself as a candidate for National Secretary in the January 2025 election and accepted the nomination.

RESPONSE: SIA interprets "November 2025" as a typo intended to read "November 2024" and based on that interpretation SIA admits the allegations of paragraph 31 except SIA denies that it refers to its Executive Leaders and National Representative Board as the "Executive

Board." SIA affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board." SIA denies the allegations of paragraph 31 as to November 2025.

32. SIA's Executive Board—whose members had just nominated themselves—found that Coates, Spurgeon, Bessone, and Quinn met the qualifications to run for office.

RESPONSE: SIA denies that it refers to its Executive Leaders and National Representative Board as the "Executive Board." SIA affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board." SIA denies that all members nominated themselves but admits the remaining allegations of paragraph 32

33. At least one SIA member—Alexis Reusser-Lenhart—would have nominated herself or Amy Hurst as a candidate for National President had she been made aware that nominations for the January 2025 election were held at the November 2024 Executive Board meeting.

RESPONSE: SIA denies that it refers to its Executive Leaders and National Representative Board as the "Executive Board." SIA affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board." SIA lacks knowledge or information sufficient to respond to the remaining allegations of paragraph 33.

**SIA Imposed Unreasonable Candidate Qualifications for the January 2025 Election**

34. An earlier version of SIA's bylaws, dated March 27, 2024, stated that SIA's President and Secretary would be nominated by incumbent members of the Board.

RESPONSE: Paragraph 34 raises legal questions, is based on conclusory legal assertions, and requires no response. To the extent a response is required, SIA admits that SIA's Constitution

and Bylaws, dated March 27, 2024, provided in part, with respect to nomination and election of Executive Leadership, that "When a Representative(s) submit(s) a Letter of Intent, they may be confirmed as eligible by an anonymous plurality vote by the Board and may then be elected by a plurality vote of Members." SIA denies any allegations inconsistent with the contents of SIA's Constitution and Bylaws, dated March 27, 2024.

35. SIA has since amended its March 27, 2024 bylaws and replaced that requirement with Section 14(D)(3)(c) of the Bylaws in effect for the January 2025 election, which provides:

> A National Representative running for an Executive Leader position must: have one (1) of the following: i. Previous experience as a National Board Representative (preferred); or ii. Demonstrated comparable leadership position in a similar organization within the last five (5) calendar years[.]

RESPONSE: SIA admits that it amended its Constitution and Bylaws after March 27, 2024, and that the version of its Constitution and Bylaws in effect for the January 2025 election contained substantially the language set out in paragraph 35. SIA lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 35 because neither paragraph 34 nor paragraph 35 specifies the particular provision in SIA's March 27, 2024 Constitution and Bylaws to which the Complaint purports to refer.

36. Section 13(B) provides, "Executive Leaders are National Representatives who are elected to an Executive Leadership position."

RESPONSE: SIA admits that § 13(B) of its August 12, 2024 Constitution and Bylaws contains the quoted language. SIA affirmatively alleges that § 13(B) also contains additional subparts not excerpted in paragraph 36.

37. Only incumbent Executive Board officers were nominated as candidates for National President and National Secretary in the January 2025 election.

RESPONSE: SIA admits the allegations of paragraph 37 except SIA denies that it refers to its Executive Leaders and National Representative Board as the "Executive Board." SIA affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board."

38. Because only incumbent Executive Board members were notified of and attended the November 2024 nominations meeting, the "comparable leadership" experience provision did not apply to disqualify nominees in the January 2025 election.

RESPONSE: Paragraph 38 raises legal questions, is based on conclusory legal assertions, and requires no response. To the extent a response is required, SIA admits only that its November 2024 National Board meeting was attended only by SIA's National Board members (not all of whom are Executive Leaders) and that no person was disqualified from the January 2025 election based on § 14(D)(3)(c) of SIA's Constitution and Bylaws, dated August 12, 2024. SIA denies that it refers to its Executive Leaders and National Representative Board as the "Executive Board." SIA affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board." SIA denies the remaining allegations of paragraph 38.

**SIA Improperly Disqualified Amy Hurst as a Candidate in the January 2025 Election**

39. Under Section 14(A) of the Bylaws, to be a candidate for elected office, a member must, for the duration of their candidacy, be a member in "good standing."

RESPONSE: SIA admits that Section 14(A) of the Bylaws requires candidates for elected office to be a Member in "good standing" for the duration of their candidacy. SIA affirmatively alleges that Section 14(A) of the Bylaws also provides that, for the duration of their candidacy, a candidate for elected office must "Meet the requirements set forth in Section 9 Membership[.]"

40. Section 9(C)(1)(a) of the Bylaws defines good standing:

> A Member is in good standing (as defined in the LMRDA) unless the Member expressly (whether verbally or in writing) admits, or is determined by the National Board based on an appropriate investigation, to be engaging in, or to having engaged in during the twelve-month period preceding and including the date of such admission or determination . . . advocating or working toward the displacement of SIA as the authorized national labor representative to speak and negotiate on behalf of SkyWest's Flight Attendants[.]

RESPONSE: SIA admits that Section 9(C)(1)(a) of the Bylaws contains substantially the excerpted language, although the excerpt in paragraph 40 of the Complaint omits language and text and has modified the formatting contained in the Bylaws. SIA denies any remaining allegations of paragraph 40.

41. Around November 4, 2023, SIA member Amy Hurst complained to SkyWest Airlines' human resources division that Coates and other SIA officers sent a communication to SIA members that included her name without her consent. In her complaint, Hurst stated that SIA officers told her they did not need her consent to include her name in the communication.

RESPONSE: SIA lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 41 and on that basis denies the allegations of paragraph 41.

42. A few weeks later, Hurst posted on social media that she had signed a union card for a rival labor organization because she believed SIA was not a labor organization under federal laws.

RESPONSE: SIA admits that in early November 2023 Hurst posted on social media that she had signed a union card for a rival labor organization and questioned SIA's status. SIA denies that it was not a labor organization under federal laws and denies the remaining allegations of this paragraph.

43. About a month later, Hurst emailed SIA's Executive Council, which included Coates and now National Vice President Loretta France, declaring her intent to run in SIA's January 2024 election for a Representative position.

RESPONSE: SIA admits the allegations of paragraph 43 except SIA denies that it refers to its Executive Leaders and National Representative Board as the "Executive Council." SIA affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board."

44. SIA notified Hurst on December 29, 2023, that she was disqualified from running in the January 2024 election for breaching a duty of loyalty by "recently and publicly [speaking] and act[ing] against SIA in regard to its continuing to be the representative of SkyWest's Flight Attendants," and by advocating for a different organization to "ostensibly replace SIA" based on her November social media post.

RESPONSE: SIA admits that it informed Hurst in an emailed written statement on December 29, 2023, that, based on her admitted misconduct toward SIA in the form of disloyalty (including by providing the rival labor organization a signed authorization card opposing SIA), she was disqualified from running for SIA office and that language similar to the quoted language appeared in that written statement.

45. On January 3, 2024, Hurst emailed SkyWest Airlines' human resources division about alleged actions by a member of SIA's leadership.

RESPONSE: On information and belief, SIA admits that Hurst emailed SkyWest Airlines' human resources division about alleged actions by a member of SIA's leadership. SIA lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 45 and on that basis denies the remaining allegations of paragraph 45.

46. Later, SIA announced a September 2024 election. Hurst nominated herself to run for a National Board of Representative position in that election.

RESPONSE: SIA admits the allegations of paragraph 46.

47. On August 20, 2024, the Board of Representatives sent Hurst a "Notice of Standing" that barred Hurst from being a candidate in the September 2024 election because, in SIA's view, her November 2023 social media post violated Section 14 of the Bylaws.

RESPONSE: SIA admits that on August 20, 2024, SIA sent Hurst a "Notice of Standing" but denies the remaining allegations of paragraph 47. SIA affirmatively alleges that that Notice of Standing was an email from SIA Vice President Loretta France which (a) expressed concern about Hurst's claimed eligibility to run for office, in light of the fact and content of Hurst's social media post in November 2023; (b) constituted an initial determination that Hurst was not eligible to run for office; and (c) invited Hurst to appeal the matter in accordance with SIA's Bylaws and provided extensive information about the appeal process. SIA clarifies that it interprets "Board of Representative" here to mean SIA's National Board.

48. The Notice of Standing did not contain or reference any possible negative impacts to her SIA membership status beyond disqualification as a candidate in the September 2024 election.

RESPONSE: SIA admits that the August 20, 2024 "Notice of Standing" did not directly contain or reference possible negative impacts to Hurst's SIA membership beyond disqualification as a candidate in the September 2024 election but denies any remaining allegations in paragraph 48.

49. Hurst timely appealed her disqualification to SIA leadership, and on August 23, 2024, Vice President France emailed Hurst to schedule a hearing.

RESPONSE: SIA admits the allegations of paragraph 49.

50. Days later, France offered hearing dates of August 26 and 27, 2024. In France's emails attempting to schedule a hearing, she did not mention that Hurst could call or cross-examine witnesses, or that any discipline could extend beyond Hurst's disqualification from the September 2024 election.

RESPONSE: SIA denies the allegations of paragraph 50. SIA affirmatively alleges that: (a) on or about August 23, 2024, France emailed Ms. Hurst and expressly proposed to her several possible dates for a hearing the following week; (b) France explained that, if Hurst were to pursue an appeal, "the Board will entertain and carefully consider your appeal along with any additional supporting information you might timely submit on your behalf"; (c) France did not state or suggest that Hurst would not be allowed to call or cross-examine witnesses; and (d) at no point did Hurst state or suggest that she might have any interest or desire to call or cross-examine witnesses.

51. A video conference hearing was held on August 26, 2024.

RESPONSE: SIA admits the allegations of paragraph 51. SIA affirmatively alleges that Hurst simply referred to the written appeal she had filed and offered no supporting evidence. France offered Hurst an opportunity wherein she could provide an explanation for her support of the rival labor organization.

52. Hurst, France, Coates, and other SIA officers participated in the video conference.

RESPONSE: SIA admits the allegations of paragraph 52.

53. From France's statements during the video conference, Hurst understood that the conference was limited to Hurst's eligibility to run for office in the September 2024 election.

RESPONSE: SIA lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 53 and on that basis denies the allegations of paragraph 53.

54. During the video conference, Hurst was not informed that any consequences could affect her other membership rights, or that she could call her own witnesses or cross-examine those called by SIA.

RESPONSE: SIA denies the allegations of paragraph 54. SIA affirmatively alleges that Hurst was also informed of these things before the hearing, and that Hurst was also directed during the video conference to Bylaws that provide for potential consequences.

55. To support the Board of Representatives' claim that Hurst was disloyal to SIA, France presented statements about the function of union authorization cards, SIA's status as a labor organization, and SIA's legal representation at a specific time.

RESPONSE: SIA admits the allegations of paragraph 55 except SIA clarifies that it interprets "Board of Representatives" here to mean SIA's National Board.

56. When Hurst attempted to rebut one of France's statements during the video conference, Coates interrupted to say the purpose of the video conference was not to argue but to hear about Hurst's charge of disloyalty.

RESPONSE: SIA denies the allegations of paragraph 56. SIA affirmatively alleges that both SIA and Hurst were afforded the opportunity to present their position as to Hurst's standing as a member of SIA. Hurst declined to provide additional information for consideration.

57. On August 27, 2024, France, on behalf of the Board of Representatives, denied Hurst's appeal and affirmed the Notice of Standing.

RESPONSE: SIA admits the allegations of paragraph 57 except SIA clarifies that it interprets "Board of Representatives" here to mean SIA's National Board.

58. In early September, Hurst requested to further appeal her disqualification before either an arbitrator or an ethics panel as outlined in SIA's Bylaws.

RESPONSE: SIA admits the allegations of paragraph 58.

59. In response, SIA emailed a former coworker of SIA's legal counsel (Gregg Formella) to arbitrate Hurst's dispute.

RESPONSE: SIA admits that a communication was initiated by SIA's legal counsel to a qualified arbitrator who potentially could arbitrate Hurst's appeal, who was a former co-worker of Mr. Formella. SIA denies any insinuation that: (a) there was anything inappropriate about the referenced contact; and (b) that the contact was anything more than an inquiry regarding SIA's interest in possibly having the arbitrator arbitrate the matter.

60. The arbitrator responded to an email Formella had sent (but did not copy Hurst) on September 4, 2024, at 1:38 p.m. and outlined several terms Hurst and SIA would need to accept for the arbitration to proceed. Among those terms were:

a. Affirmatively waive any conflicts arising from the arbitrator's former working relationship with Formella;

b. Pay $1,000 each; and

c. Appear the next day, September 5, 2024, for the arbitration, with a decision issued by September 6, 2024.

RESPONSE: SIA admits that the arbitrator responded to Mr. Formella around 12:38 p.m. (MT) on September 4, 2024, and that it appears he did not copy Hurst. He identified "a number of items to address before I can agree to serve as the arbitrator in this matter." SIA admits that he required affirmative waiver of conflicts by both parties. He stated that "Provided the parties stipulate to the submission of all evidence and argument on Thursday, September 5, 2024, I will provide a final and binding decision no later than close of business on Friday, September 6, 2024." He outlined one of two processes for the parties to submit evidence and argument. Finally, he reduced his fee to $2,000 split evenly between the parties for the two-day proceeding and stated that the appellant would be required to pay a $100 "initial case management fee," with the remaining $900 invoiced later. The arbitrator did not state that the arbitration would need to take place on September 5, 2024, or on any particular day.

61. At 4:50 p.m. on September 4, 2024, France emailed Hurst to disclose the $1,000 fee Hurst would have to pay as well as the process and timeline for submitting evidence to the arbitrator. France's email did not disclose the arbitrator's potential conflict of interest.

RESPONSE: SIA admits the allegations of paragraph 61, except to clarify that France's email was sent at or about 2:50 p.m. MT. SIA affirmatively alleges that France's email inadvertently did not include the arbitrator's communication and France, at the first opportunity, subsequently sent it to her.

62. At 7:53 p.m. on September 4, 2024, France forwarded an email from the arbitrator to Hurst that disclosed, for the first time, the potential conflict of interest.

RESPONSE: SIA admits that France sent the email referenced in paragraph 62 on September 4, 2024, at 5:52 p.m. MT. SIA lacks knowledge or information sufficient to rule out the possibility of a prior disclosure to Hurst and to that extent denies the remaining allegations of paragraph 62.

63. At 1:23 p.m. on September 5, 2024, France emailed the arbitrator that Hurst had not responded to the arbitrator's proposal, and that "[o]f course, if Ms. Hurst does not meaningfully respond by whatever deadline you may determine appropriate for her to do so, SIA's position would be that Ms. Hurst has abandoned her appeal and lost any right to proceed with it."

RESPONSE: SIA admits the allegations of paragraph 63, except to clarify that the time France sent the email on September 5, 2024, was around 11:23 a.m. MT. SIA affirmatively alleges that France wrote the arbitrator that, "To SIA's knowledge, Ms. Hurst has not responded and we are not aware of anything suggesting that she intends to proceed with her appeal. That said, SIA is amenable to Ms. Hurst being once again extended additional time to respond as to her position or to ask any questions she might have, but obviously such additional extension would need to be reasonably limited to the extent of accommodating the timeframe previously indicated whereby

you would be able to issue your decision on the merits of her appeal by 12:00 p.m. CT on Monday, September 9." The timelines were necessitated by the upcoming election.

64. At 1:42 p.m. on September 5, 2024, the arbitrator emailed France and Coates (but did not copy Hurst) stating that submissions had to be filed by 6:00 p.m. that day for the arbitration to proceed.

RESPONSE: SIA admits that, on September 5, 2024, at approximately 12:42 p.m. MT, the arbitrator sent an email explaining the submission deadline and other items relating to potential arbitration. SIA otherwise denies the allegations of paragraph 64. SIA affirmatively alleges that: (a) Hurst was included as an addressee on the email from the arbitrator; and (b) between the time of this email (around 12:42 p.m. MT) and approximately 10:05 p.m. MT on September 5, 2024, there were several emails on which the arbitrator, SIA, and Hurst were all included; and (c) Hurst did not send or respond to any of those emails.

65. At 11:06 p.m. on September 5, 2024, Hurst objected to the arbitrator's fee and his conflict of interest, stating, "I do not . . . consent to having an attorney that has worked with SIA's legal counsel. Nor do I agree to the fee's [sic]. I requested a FAIR and UNBIASED appeal." Hurst also wrote: "[i]f SIA wishes me to pay I will request that an individual of my choosing be used."

RESPONSE: SIA admits the allegations of paragraph 65.

66. On September 9, 2024, Coates emailed Hurst that SIA considered Hurst to have abandoned her appeal, and that "the determination of your ineligibility to run for office stands[.]"

RESPONSE: SIA admits the allegations of paragraph 66.

67. Since the September 9, 2024, email from Coates, SIA has not initiated any new disciplinary proceedings against Hurst.

RESPONSE: SIA admits the allegations of paragraph 67.

68. On January 9, 2025, Hurst emailed SIA to express her intent to run for National President in the January 2025 election.

RESPONSE: SIA admits that on or about January 9, 2025, Hurst emailed SIA to express her intent to run for National President in the January 2025 election.

69. On January 18, 2025, France responded to Hurst's January 9, 2025, email, stating that based on the August 20, 2024 "Notice of Standing" (and the Board's affirmation of that notice), Hurst was ineligible for consideration as a candidate in any SIA election until her privileges are reinstated on August 27, 2025.

RESPONSE: SIA admits the allegations of paragraph 69 but denies that these were the only bases set forth in France's email. SIA affirmatively alleges that France's January 18, 2025 email also explained that Hurst was ineligible for consideration as a candidate in accordance with SIA's Constitution and Bylaws.

70. On information and belief, Hurst was the only SIA member that was declared ineligible to be a candidate in the January 2025 election.

RESPONSE: SIA admits the allegations of paragraph 70.

**SIA's January 2025 Election**

71. Between January 21-28, 2025, SIA held an election for National President and National Secretary, which was conducted by secret ballot among SIA's members in good standing.

RESPONSE: SIA admits the allegations of paragraph 71.

72. France served as the election chair for the January 2025 election.

RESPONSE: SIA admits the allegations of paragraph 72.

73. SIA used a third-party vendor, ElectionBuddy, to conduct the election via electronic voting.

RESPONSE: SIA admits the allegations of paragraph 73.

74. ElectionBuddy mailed an election notice to all SIA members at the end of December 2024.

RESPONSE: SIA admits the allegations of paragraph 74. SIA affirmatively alleges that notice was also provided to SIA members at other times by other means.

75. On January 20, 2025, SIA posted a list of candidates for the January 2025 election on its Facebook page.

RESPONSE: SIA admits that this information was posted on SIA's Facebook page on or about January 21, 2025. SIA affirmatively alleges that all candidate information was provided by other means, including being posted on SIA's website, WeAreSia.com, on or about January 13, 2025. This information was reiterated in a post in the SIA Facebook group on or about January 21, 2025.

76. Voting for the election opened at 8:00 a.m. MT January 21, 2025, and closed at 5:00 p.m. MT on January 28, 2025.

RESPONSE: SIA admits the allegations of paragraph 76.

77. Coates was elected as National President by a margin of 63 votes (564 votes for Coates and 501 votes for Spurgeon).

RESPONSE: SIA admits that Coates was elected as National President by approximately the margin stated in paragraph 77.

78. Bessone was elected as National Secretary by a margin of 61 votes (563 votes for Bessone and 502 votes for Quinn).

RESPONSE: SIA admits that Bessone was elected as National Secretary by approximately the margin stated in paragraph 78.

79. Coates and Bessone will serve four-year terms[1] as National President and National Secretary, respectively.

RESPONSE: SIA admits the allegations of in the body of paragraph 79. SIA admits that the Secretary filed against SIA the action referenced in footnote 1 to paragraph 79 of the Complaint and makes those allegations in that case but SIA denies those allegations and denies that it has violated the LMRDA.[6]

**SIA Members Timely Protest the January 2025 Election**

80. Section 19(C)(1) of the Bylaws outlines the process for appealing the election:

> Any Member who is eligible to vote in a given election and who has a concern with or wishes to appeal the election process or outcome shall, if desired, appeal to the Board in writing immediately upon identifying a specific concern and in any event (non-awareness notwithstanding) no later than seven (7) calendar days following the certification date.

RESPONSE: SIA admits that this language appears in Section 19(C)(1) of SIA's Constitution and Bylaws, revised August 12, 2024, and that this language outlines part of the process for appealing an election. SIA denies that this paragraph or language outlines the full process for appealing an election under the Bylaws.

---

[6] Paragraph 79 of the Complaint includes a footnote 1 alleging: "In the companion case of *DeRemer v. SkyWest Inflight Association*, Case No. 2:24-cv-00492-DBB-DBP, the Secretary has alleged that SIA's failure to elect its officers at least once every three years constitutes a violation of the LMRDA."

81. The Bylaws, in Section 19(C)(3), also require the Board to "render a decision within a reasonable timeframe following the receipt of an election challenge."

RESPONSE: SIA admits the allegations of paragraph 81.

82. Section 19(C)(4) of the Bylaws provides deadlines and further procedures for appeals:

> Within seven (7) calendar days of the Board's decision and notification, the Member may further appeal in writing for the Board's referral, at its discretion, to the Arbitrator or an Ethics Panel Review (Section 20).

RESPONSE: SIA admits that this language appears in Section 19(C)(4) of SIA's Constitution and Bylaws, revised August 12, 2024, and that this language provides some deadlines and procedures for appeals. SIA denies that this paragraph provides all applicable deadlines or procedures for appeals.

83. According to Section 20(A) of the Bylaws, the Board may, in its discretion, "appoint an Arbitrator or refer to the Ethics Committee for a Panel Review of the charge(s) or appeal(s) described herein."

RESPONSE: SIA admits that this language appears in Section 20(A) of SIA's Constitution and Bylaws, revised August 12, 2024.

84. Reusser-Lenhart first learned on January 20, 2025, that nominations for the January 2025 election had already happened among the incumbent Executive Board officers when she saw a post on SIA's Facebook page announcing the candidates in the election.

RESPONSE: SIA denies that it refers to its Executive Leaders and National Representative Board as the "Executive Board." SIA affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board." SIA admits that

nominations for the January 2025 election were posted on SIA's Facebook page on or about January 21, 2025. SIA lacks knowledge or information sufficient to form a belief about the truth of the allegations about what Reusser-Lenhart "learned" or when she "learned" them and on that basis denies the remaining allegations of paragraph 84.

85. Anna Miroslawska, a SIA member in good standing, first learned about Hurst's disqualification as a candidate in the January 2025 election on January 21, 2025, when she saw the same January 20, 2025, post on SIA's Facebook page. She later spoke with Hurst.

RESPONSE: SIA admits that Hurst was disqualified as a candidate for the January 2025 election and that this was posted on SIA's Facebook page on or about January 20, 2025. SIA admits that Miroslawska was a SIA member in good standing in January 2025. SIA lacks knowledge or information sufficient to form a belief about the truth of the allegations about what Miroslawska "learned" or when she "learned" them and about whether or when Miroslawska may or may not have spoken with Hurst and on that basis denies the remaining allegations of paragraph 85.

86. Reusser-Lenhart filed her initial protest with SIA at 1:52 a.m. on January 21, 2025.

RESPONSE: SIA admits Reusser-Lenhart filed her initial protest on or about the date and time listed in paragraph 86.

87. In this initial protest, Reusser-Lenhart wrote:

> I would like to formally inquire and protest the nomination meeting for the upcoming election. I did not receive proper notice of this meeting, nor was I provided an opportunity to participate in the nomination process. . . . I protest this missed opportunity to nominate candidates as I was considering nominating myself and/or Amy Hurst for one of the available positions, but the lack of timely notice and overall opportunity to participate in the nomination process prevented me from doing so. . . . Today I realized that, once

> again, the board has chosen to nominate solely from within its own ranks. I must protest this issue. . . . Criteria such as occupying a lower board position as a prerequisite for nomination are prohibited under federal law.

RESPONSE: SIA admits that this language appears in Reusser-Lenhart's initial protest but denies that the contents of that statement are accurate and that Reusser-Lenhart's protest was valid. SIA denies that it has engaged in any wrongdoing or violation of law.

88. Miroslawska filed her initial protest with SIA on January 22, 2025.

RESPONSE: SIA admits the allegations of paragraph 88.

89. Miroslawska's initial protest stated that SIA failed to allow members to participate and run as candidates in the election.

RESPONSE: SIA admits that Miroslawska's initial protest made such statements but denies that they were accurate and that Miroslawska's protest was valid. SIA denies that it has engaged in any wrongdoing or violation of law.

90. SIA denied Reusser-Lenhart's initial protest on April 15, 2025, because, SIA claimed, it was not timely filed. SIA listed another reason for denial: "vague, lacking clarity and specificity to the extent of being indecipherable and/or requiring interpretative speculation by the reader[.]"

RESPONSE: SIA admits that it denied Reusser-Lenhart's initial protest on or about April 15, 2025, including for the reasons stated.

91. SIA also denied Miroslawska's initial protest on April 15, 2025, because, SIA claimed, her allegations were "time-barred" and "vague, lacking sufficient clarity and specificity[.]"

RESPONSE: SIA admits that it denied Miroslawska's initial protest on or about April 15, 2025, including for the reasons stated.

92. Responding to Miroslawska's allegation that SIA did not allow members to participate and run as candidates in the election, SIA wrote:

> As an initial matter, your allegation is rejected as vague and misleading . . . [I]t does not identify anyone who might actually have been harmed by any violation. To the extent the allegation would refer to a Member who is not in good standing, it is actionable and without merit because a Member [who] is not in good standing has no right to "participate" or "run" in an election. You have provided no evidence of any actual, actionable harm to any individual.

RESPONSE: SIA admits that this language appears in SIA's response to Miroslawska's protest except that SIA's response stated that the allegation about a Member who is not good standing is "inactionable" not "actionable." SIA affirmatively alleges that the excerpted language reflects only part of SIA's response.

93. Reusser-Lenhart submitted a written appeal to SIA on April 21, 2025: "I am writing to formally appeal the union's unilateral decision regarding my election protest[.] . . . I . . . respectfully request my election protest[] be reevaluated."

RESPONSE: SIA admits that Reusser-Lenhart submitted a written appeal to SIA on or about April 21, 2025, that contained this language.

94. Miroslawska also appealed on April 21, 2025, writing: "I am writing to formally appeal the decision regarding [my protest] . . . related to the January 2025 SIA union election. . . I believe a reevaluation is necessary[.]"

RESPONSE: SIA admits that Miroslawska submitted a written appeal to SIA on or about April 21, 2025, that contained this language.

95. Two-days later, SIA denied both Reusser-Lenhart's and Miroslawska's appeals because, SIA claimed, they "failed to assert [their] rights under SIA's Constitution and Bylaws to request the Board refer [their] claimed concerns to an Arbitrator or Ethics Panel for a final review and binding determination."

RESPONSE: SIA admits that it denied both Reusser-Lenhart's and Miroslawska's appeals on or about April 23, 2025, and that this language appears in SIA's denial of those appeals.

**Reusser-Lenhart's and Miroslawska's Complaints are Properly Before DOL**

96. Miroslawska filed her complaint with the DOL's Office of Labor-Management Standards (OLMS) on April 25, 2025, and incorporated by reference all the issues she internally protested before SIA.

RESPONSE: SIA lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 96 and on that basis denies the allegations of paragraph 96.

97. Reusser-Lenhart filed her complaint with OLMS on April 29, 2025, and incorporated by reference all the issues she internally protested before SIA.

RESPONSE: SIA lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 97 and on that basis denies the allegations of paragraph 97.

98. Pursuant to Section 601 of the LMRDA, 29 U.S.C. § 521, and in accordance with Section 402(b) of the LMRDA, 29 U.S.C. § 482(b), OLMS investigated Reusser-Lenhart's and Miroslawska's complaints and, as a result of the facts shown by its investigation, found probable cause to believe that a violation of Title IV of the LMRDA had occurred and has not been remedied to date.

RESPONSE: SIA lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 98 about any purported "investigation" or "facts" of findings by OLMS and on that basis denies those allegations. SIA denies that it has engaged in any wrongdoing or violation of law. The remaining allegations of paragraph 98 consist of legal conclusions which require no response. To the extent a response is required, SIA denies those allegations.

99. By agreement signed May 13, 2025, SIA agreed that the time within which the Secretary may bring suit be extended to July 11, 2025.

RESPONSE: SIA admits that, subject to a reservation of rights, defenses, and objections, on or about the date listed, it agreed to extend the time within which the DOL may bring suit based on complaints referenced in that agreement to July 11, 2025.

100. By agreement signed May 20, 2025, SIA agreed that the time within which the Secretary may bring suit be extended to July 21, 2025.

RESPONSE: SIA admits that, subject to a reservation of rights, defenses, and objections, on or about the date listed, it agreed to extend the time within which the DOL may bring suit based on complaints referenced in that agreement to July 21, 2025.

101. By agreement signed July 1, 2025, SIA agreed that the time within which the Secretary may bring suit be extended to August 4, 2025.

RESPONSE: SIA admits that, subject to a reservation of rights, defenses, and objections, on or about the date listed, it agreed to extend the time within which the DOL may bring suit based on complaints referenced in that agreement to August 4, 2025.

102. By agreement signed August 1, 2025, SIA agreed that the time within which the Secretary may bring suit be extended to August 11, 2025.

RESPONSE: SIA admits that, subject to a reservation of rights, defenses, and objections, on or about the date listed, it agreed to extend the time within which the DOL may bring suit based on complaints referenced in that agreement to August 11, 2025.

103. By agreement signed August 11, 2025, SIA agreed that the time within which the Secretary may bring suit be extended to August 18, 2025.

RESPONSE: SIA admits that, subject to a reservation of rights, defenses, and objections, on or about the date listed, it agreed to extend the time within which the DOL may bring suit based on complaints referenced in that agreement to August 18, 2025.

104. By agreement signed August 18, 2025, SIA agreed that the time within which the Secretary may bring suit be extended to August 20, 2025.

RESPONSE: SIA admits that, subject to a reservation of rights, defenses, and objections, on or about the date listed, it agreed to extend the time within which the DOL may bring suit based on complaints referenced in that agreement to August 20, 2025.

## FIRST CAUSE OF ACTION

*Failure to Provide a Reasonable Opportunity to Nominate*

105. The Secretary repeats and incorporates all previous paragraphs.

RESPONSE: SIA repeats and incorporates all prior answers.

106. 29 U.S.C. § 481(e) requires that "[i]n any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates[.]"

RESPONSE: SIA avers that the LMRDA speaks for itself. To the extent a response is required, SIA admits that this is a quote from a portion of the LMRDA.

107. 29 C.F.R. § 452.56(a) states, "[t]o meet [the nomination notice requirement of 29 U.S.C. § 481(e)], the labor organization must give timely notice reasonably calculated to inform all members of the offices to be filled in the election as well as the time, place, and form for submitting nominations."

RESPONSE: SIA avers that the cited regulation speaks for itself. To the extent a response is required, SIA admits that this is a quote (with modification) from the cited regulation.

108. SIA failed to provide SIA members a reasonable opportunity to nominate candidates in violation of 29 U.S.C. § 481(e) when it: (1) failed to provide notice of nominations for the January 2025 election, and (2) allowed only incumbent Executive Board members to nominate candidates for the January 2025 election.

RESPONSE: SIA denies the allegations of paragraph 108. SIA also denies that it refers to its Executive Leaders and National Representative Board as the "Executive Board." SIA affirmatively alleges that its Executive Leaders and National Representative Board are properly referred to as the "National Board."

**SECOND CAUSE OF ACTION**

*Imposition of an Unreasonable Candidate Qualification*

109. The Secretary repeats and incorporates all previous paragraphs.

RESPONSE: SIA repeats and incorporates all prior answers.

110. 29 U.S.C. § 481(e) requires that "every member in good standing shall be eligible to be a candidate to hold office (subject to section 504 and to reasonable qualifications uniformly imposed)[.]"

RESPONSE: SIA avers that the LMRDA speaks for itself. To the extent a response is required, SIA admits that similar language appears in the LMRDA but affirmatively alleges that

the LMRDA contains language not included in, or identified as omitted from, the purported quote above.

111. 29 C.F.R. § 452.40 states, "A requirement that candidates for office have some prior service in a lower office is not considered reasonable."

RESPONSE: SIA avers that the cited regulation speaks for itself. To the extent a response is required, SIA admits that this is a quote from the cited regulation.

112. SIA violated 29 U.S.C. § 481(e) when it required members to have prior experience to be eligible for Executive Leader positions.

RESPONSE: SIA denies the allegations of paragraph 112.

**THIRD CAUSE OF ACTION**

*Improper Disqualification of Amy Hurst as a Candidate*

113. The Secretary repeats and incorporates all previous paragraphs.

RESPONSE: SIA repeats and incorporates all prior answers.

114. 29 U.S.C. § 481(e) requires that "every member in good standing shall be eligible to be a candidate to hold office (subject to section 504 and to reasonable qualifications uniformly imposed)[.]"

RESPONSE: SIA avers that the LMRDA speaks for itself. To the extent a response is required, SIA admits that similar language appears in the LMRDA but affirmatively alleges that the LMRDA contains language not included in, or identified as omitted from, the purported quote above.

115. 29 C.F.R. § 452.50 provides, in part:

> Section 401(e) was not intended to limit the right of a labor organization to take disciplinary action against members guilty of misconduct. So long as such action is conducted in accordance with

> Section 101(a)(5), a union may, for example, if its constitution and bylaws so provide, bar from office for a period of time any member who is guilty of specific acts . . . However, if a union has improperly disciplined a member and barred him from candidacy, the Secretary may, in an appropriate case, treat him as a member in good standing entitled to all the rights of members guaranteed by title iv.

RESPONSE: SIA avers that the LMRDA speaks for itself. To the extent a response is required, SIA admits that similar language appears in the LMRDA but affirmatively alleges that the LMRDA contains language not included in, or identified as omitted from, the purported quote above.

116. 29 U.S.C. § 411(a)(5) provides:

> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare a defense; (C) afforded a full and fair hearing.

RESPONSE: SIA avers that the cited regulation speaks for itself. To the extent a response is required, SIA admits that this is a quote from the cited regulation.

117. SIA violated 29 U.S.C. § 481(e) when it disciplined Hurst by disqualifying her from running in the January 2025 election for breaching a duty of loyalty, by failing to provide:

a. Written specific charges notifying Hurst, among other things, that the proceeding against Hurst only related to the candidate eligibility requirements set forth in Section 14 of SIA's Bylaws, and that penalties could exceed disqualification from running for office in the September 2024 election.

b. A reasonable time for Hurst to prepare a defense; and

c. A full and fair hearing that should have, among other things, allowed Hurst to call and cross-examine witnesses, barred France and Coates from participating, and been conducted before an unbiased tribunal that did not prejudge the outcome.

RESPONSE: SIA denies the allegations of paragraph 117.

**FIRST AFFIRMATIVE DEFENSE**

The Complaint fails to state a claim upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE**

The Secretary's claims are barred in whole or in part to the extent Miroslawska, Reusser-Lenhart, and Hurst failed to timely file internal complaints with SIA and/or failed to exhaust remedies available under SIA's Constitution and Bylaws.

**THIRD AFFIRMATIVE DEFENSE**

The Secretary's claims are barred in whole or in part to the extent complaints were not timely filed with the Secretary.

**FOURTH AFFIRMATIVE DEFENSE**

Any claim based on the alleged violation of the LMRDA fails and/or is mooted by the fact that it did not affect the outcome of any election, including, among other things, that Hurst was appropriately disqualified due to her admission that she had engaged in conduct seeking to replace SIA as the labor representative of SkyWest Flight Attendants. *See, e.g.*, *Aircraft Mechanics Fraternal Ass'n v. Transp. Workers Union of Am., Loc. 514, Air Transp. Div., AFL-CIO*, 98 F.3d 597 (10th Cir. 1996) (finding that a labor organization has a right to protect its institutional interests

by disciplining a member for support of a rival labor organization, such as signing an authorization card for the rival in order to trigger a representation election).

**FIFTH AFFIRMATIVE DEFENSE**

Some or all of the Secretary's claims may be moot and barred if SIA conducts a trial *de novo* regarding Ms. Hurst's candidacy/disqualification, thereby curing any potential violations that might have occurred, and the trial *de novo* finds for Ms. Hurst's disqualification. *See, e.g.*, *Walsh v. Loc. 568, Transp. Workers Union of Am., AFL-CIO*, No. 1:22-CV-21644-KMM, 2023 WL 6978985 (S.D. Fla. June 6, 2023), *reconsideration denied sub nom. Su v. Loc. 568, Transp. Workers Union of Am., AFL-CIO*, 699 F. Supp. 3d 1333 (S.D. Fla. 2023), and *appeal dismissed sub nom. Sec'y of Lab., United States Dep't of Lab. v. Loc. 568, Transp. Workers Union of Am. AFL-CIO*, No. 23-14119-AA, 2024 WL 3020508 (11th Cir. Mar. 18, 2024).

**SIXTH AFFIRMATIVE DEFENSE**

The Secretary's investigation and complaint are based on agency regulations that are not viable in light of the United States Supreme Court's decisions in *Loper Bright v. Raimondo* and *Relentless, Inc. v. Dep't of Commerce*, 603 U.S. 369 (2024).

**SEVENTH AFFIRMATIVE DEFENSE**

The Secretary has engaged in arbitrary, capricious and discriminatory treatment and regulation of SIA, including, among other things, because the Secretary has long permitted numerous other labor organizations that are similarly situated to SIA to be regarded/regulated as "national organizations."

**EIGHTH AFFIRMATIVE DEFENSE**

The Secretary is not entitled to injunctive or declaratory relief, including because it will not suffer any irreparable injury if such relief is declined, and because DOL cannot show any material or irreparable injury.

**NINTH AFFIRMATIVE DEFENSE**

The Secretary's treatment of SIA throughout the agency's administrative investigation process, and in regard to the outcome of its investigation process, has been arbitrary, capricious, discriminatory, unfair, and otherwise violative of SIA's rights, so as to preclude any determination or award against SIA or in favor of the Secretary.

**TENTH AFFIRMATIVE DEFENSE**

The election complaints submitted by SIA members were invalid and inaccurate. Accordingly, the Secretary lacked authority and jurisdiction to take up the protests and to file this action.

**ELEVENTH AFFIRMATIVE DEFENSE**

The Secretary's claims are barred in whole or in part because the Secretary failed to properly and sufficiently investigate and/or to find probable cause to believe a violation occurred and had not been remedied. Accordingly, the Secretary lacked authority and jurisdiction to file this action.

**TWELFTH AFFIRMATIVE DEFENSE**

The Secretary's claims are barred in whole or in part because the Secretary failed to follow the DOL's published guidance regarding the investigation process, including, but not limited to, failing to provide SIA with notice and an opportunity to correct the alleged violations through voluntary compliance and failing to issue a final determination.

**THIRTEENTH AFFIRMATIVE DEFENSE**

In her investigation and treatment of SIA, the Secretary violated basic principles of fairness and due process rights of SIA including, among other things, by failing and refusing throughout the administrative process to provide SIA with a copy of what it claims were Miroslawska's, Reusser-Lenhart's, and Hurst's complaints.

**FOURTEENTH AFFIRMATIVE DEFENSE**

The Secretary's lawsuit is barred to the extent it goes beyond the scope of Miroslawksa's, Reusser-Lenhart's, Hurst's, or any other SIA members' complaint.

**FIFTEENTH AFFIRMATIVE DEFENSE**

Some or all of the Secretary's claims fail in whole or in part because SIA provided a reasonable opportunity for the nomination of candidates and/or because, as a national labor organization under the LMRDA, SIA was permitted to, and did, nominate candidates at a convention of delegates chosen by secret ballot.

**SIXTEENTH AFFIRMATIVE DEFENSE**

Some or all of the Secretary's claims fail in whole or in part because any qualification requirements were reasonable and uniformly imposed.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

Some or all of the Secretary's claims fail in whole or in part because SIA is a "national" labor organization under the LMRDA.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

To the extent SIA's classification as a "national" or "local" labor organization is at issue, the Secretary's treatment of the question violated SIA's due process rights because the Secretary

did not give SIA legally sufficient notice of its investigation and consideration of SIA's classification.

**NINETEENTH AFFIRMATIVE DEFENSE**

The Secretary's claims are barred in whole or in part to the extent the Secretary has violated SIA's Due Process rights.

**TWENTIETH AFFIRMATIVE DEFENSE**

SIA—which has long claimed (in its Constitution and Bylaws and otherwise) the status of, has long held itself out to its membership as, and has long operated as a "national" labor organization under the LMRDA—has legitimate claims of entitlement and cognizable property and reputational interests in its classification as a "national" labor organization. As relates to these claims and interests, DOL violated Due Process in putatively reclassifying SIA as a "local" labor organization after failing or refusing to provide SIA adequate notice and a hearing over the question.

**RESERVATION OF RIGHTS**

Any allegation against SIA that SIA has not specifically admitted should be regarded as, and is, denied.

SIA has not knowingly or intentionally waived any applicable affirmative defense and reserves the right to assert and rely on such other applicable affirmative defenses as may later become available or apparent.

SIA further reserves the right to amend its answer and/or affirmative defenses accordingly and/or to delete affirmative defenses that it determines are not applicable during the course of

discovery or otherwise. Nothing stated herein constitutes a concession as to whether or not the DOL bears the burden of proof on any issue.

## PRAYER FOR RELIEF

WHEREFORE, SIA prays as follows:

1. That the DOL take nothing by reason of the Complaint;

2. That the DOL not be awarded costs or attorneys' fees;

3. That the Complaint be dismissed in its entirety, with prejudice;

4. That judgment be entered for SIA;

5. That SIA shall recover all costs of suit and reasonable attorneys' fees incurred herein; and

6. For such other relief as the court deems just and proper.

## COUNTERCLAIMS

SkyWest InFlight Association ("SIA") hereby asserts counterclaims against Lori Chavez-DeRemer, Secretary of Labor, United States Department of Labor (the "Secretary"), and the United States Department of Labor ("DOL").

## PARTIES

1. Under the Railway Labor Act ("RLA"), 45 U.S.C. 151, et seq., SIA is a nation-wide labor organization operating as the exclusive labor representative of the approximately 4,800 Flight Attendants employed by SkyWest around the country. Additionally, SIA is a national labor organization under the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"). See 29 U.S.C. § 401-531. SIA is based in Utah.

2. Lori Chavez-DeRemer is Secretary of the United States Department of Labor, a U.S. Government Executive Branch agency located in Washington, D.C.

3. The United States Department of Labor is a U.S. Government Executive Branch agency located in Washington, D.C.

## JURISDICTION AND VENUE

4. This Court has both subject matter jurisdiction over this action and personal jurisdiction over DOL pursuant to 28 U.S.C. §§ 1331, 1345, and 1361.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e).

## FACTUAL ALLEGATIONS

### General

6. SIA represents and is comprised of all SkyWest Flight Attendants currently on the seniority list who have successfully completed their FAA-required operating experience and who

are therefore a member of the Flight Attendant "Craft or Class," consistent with SIA's Constitution and Bylaws.

7. For several decades, SIA has been the exclusive labor representative for the Flight Attendants under the RLA, negotiating on their behalf with SkyWest for terms and conditions of employment including wages, hours, and benefits, etc. In addition, in December 2023, SIA was informed by the DOL that the agency had determined SIA is a labor organization under the LMRDA.

8. SIA and SkyWest are parties to a collective bargaining agreement that applies to the entire complement of SkyWest's approximately 4,800 flight attendants.

**"National" and "Local" Labor Organizations Under The LMRDA (DOL's Erroneous Categorization of SIA as a "National" Organization)**

9. DOL's lawsuit is premised on its assertion that SIA—despite the fact that it identifies as a "national" labor organization—must regard itself as, and operate as, a "local" organization under the LMRDA. Building upon that assertion, which is erroneous, DOL demands that SIA be subject to certain provisions and requirements of the LMRDA that "national" labor organizations are not subject to, which SIA should not be made subject to, and which, for reasons of SIA's legitimate institutional interests, it should not be subject to.

10. DOL's insistence that SIA be categorized a "local" labor organization is not only erroneous, it is unlawful under the RLA, the LMRDA, and other authority including the US Constitution. Moreover, it is harmful to SIA from a practical standpoint. SIA will continue to be harmed by DOL unless (a) SIA is declared a "national" labor organization under the LMRDA and (b) DOL is enjoined from violating the applicable law and SIA's rights.

11. SIA continuously engages in functions that DOL regards as functions of "national" labor organizations. Declaring SIA a "local" labor organization undermines SIA's ability to represent its members.

12. The LMRDA, as interpreted and administered by DOL, recognizes that it is appropriate for the agency, in determining a labor organization's category, to take into account the organization's own express position regarding its category. However, on information and belief, DOL in this matter failed and refused to take into account SIA's express position that it is a "national" labor organization. DOL's failure to take into account SIA's own express position that it is a "national" labor organization violated rights of SIA, was unlawful, was arbitrary, and was harmful to SIA.

13. As DOL's investigation was underway, the agency relied on its prior, albeit inaccurate and inappropriate, determination that SIA is a "local" labor organization under the LMRDA, even though it reached that determination only by means of denying SIA a full and fair hearing over the matter. DOL articulated to SIA varying and sometimes inconsistent criteria to be used in determining a labor organization's proper category. SIA, with reference to the successive sets of criteria articulated by DOL, repeatedly showed that SIA is a national labor organization. DOL responded by once again moving the goalposts further away.

14. On information and belief, DOL now bases its assertion that SIA is a "local" labor organization solely on certain portions of the LMRDA and DOL's interpretation of it. However, the LMRDA is neither the first nor the primary federal law regarding labor organizations that is central to the issues before the Court.

15. In 1926 (some 33 years before the LMRDA came about), Congress enacted the RLA to govern labor relations in the railroad industry—and in 1936 (23 years before the LMRDA came about), Congress extended the RLA to the airline industry.

16. An express purpose of the RLA is to promote the uninterrupted flow of commerce across the country through peaceful*, nation-wide* labor relations so as to prevent what otherwise could be a hodge-podge of random and unpredictable labor disruptions around the country that would harmfully ripple across the national transportation system at any given time.

17. This purpose is to be fulfilled through an RLA requirement whereby, at every railroad and airline in the country, all of the employees of a given employer (or "carrier") who are part of particular work group ("craft or class") and who are represented by a labor organization are so represented on a national basis by that single organization—regardless of, among other things, the number of those employees, the size of the carrier's transportation system, the locations where particular members of the craft or class are based or live, and the various places across the country where they might perform their work on any given day.

18. For a labor organization under the RLA, including SIA, such nation-wide representation of the entire craft or class is not only a duty and a right but also a fundamental purpose in keeping with the purposes of the RLA itself.

19. For over 30 years, SIA has exclusively represented the craft or class of all Flight Attendants employed by SkyWest, appropriately carrying out functions and purposes of a "national" labor organization.

20. The craft or class is currently comprised of approximately 4,800 Flight Attendants based in 20 cities across the country and flying into 230 US airports, 45 US states, and multiple cities within two foreign countries (Canada and Mexico).

21. The LMRDA, in keeping with the fact it is decades junior to the RLA, defers to the RLA in significant respects and explicitly states that "[n]othing contained in this chapter… shall be construed to supersede or impair or otherwise affect the provisions of the [RLA], or any of the…rights, benefits, privileges, or immunities of any …organization, representative, or person subject thereto." 29 USC § 523. As reflected below, DOL has failed to comply with this and has unlawfully ignored the LMRDA's express deference to the RLA.

22. While SIA occasionally carries out functions that DOL regards as typical of a "local" labor organization, it also carries out numerous functions—and it has various purposes—that are typical of "national" organizations. Such functions have long been incorporated in SIA's Constitution & Bylaws by reference, and many are now stated there explicitly. DOL has failed to appropriately take into account SIA's national functions and purposes.

23. To the extent DOL claims to apply a "functions and purposes" test for determining a labor organization's category, DOL has largely ignored the "purposes" part of the test, including with respect to SIA's national purposes as a labor represented governed by the RLA.

24. In contrast to DOL's insistence that SIA be categorized as a "local" labor organization, the agency has long accepted that there are numerous labor organizations that—although they are similarly situated to SIA in fundamental and significant ways—are national labor organizations under the LMRDA.

25. These numerous organizations are similarly situated to SIA in various ways such as these: (a) on information and belief, and also based the contents of certain records that are publicly accessible via DOL's website, each regards itself as a "national" labor organization; (b) each is a unitary organization (i.e., having no parent organization, no "local" or subsidiary organizations, and no other kind of organizational affiliate); (c) each is dedicated to representing all the members of a given workgroup of a single employer, regardless of where the members-employees are based or perform their work; (d) the employer (typically, an airline or a professional sports organization) operates in numerous locations around the country or even nation-wide; (e) the workgroup itself has members that are based in many of those same locations; (f) during any given period (e.g., a given week or month), most if not all of the members of the workgroup perform their work in multiple locations around the country; (g) in many cases, such organizations are (like SIA), covered by the RLA (which essentially requires labor organizations representing workgroups in the airline and railroad industries to do so on a national basis); and (h) in many, if not all, cases, the entire national workgroup is covered by a single collective bargaining agreement negotiated for them by the organization.

26. Given that each of the above-referenced, similarly situated organizations is a unitary entity, it would be disingenuous for any of them to be characterized as "the" labor organization that is "closest" to its members—precisely because such a characterization would be based on the false premise that there is some other organization(s), somehow affiliated with it, that also has some sort of role in representing the same workgroup. Nevertheless, DOL has inexplicably mischaracterized SIA in exactly this way—calling SIA "the" labor organization "closest to its

members." It would be equally "logical"—but no less erroneous—for DOL to instead characterize SIA as "furthest" from its members.

27. On information and belief, despite the fact that the unitary labor organizations referenced above are similarly situated to SIA in numerous fundamental and significant ways, at all pertinent times: (a) DOL never categorized any of them as "local" labor organizations; and (b) DOL never asserted that any of them is "the" labor organization "closest to its members."

28. During DOL's administrative investigation, SIA reminded DOL of many of the numerous, above-referenced organizations that are similarly situated to SIA, but that DOL has long regarded as "national" labor organizations. DOL never provided any explanation as to why it recognizes them as "national" organizations but insists on categorizing SIA as a "local" labor organization.

29. During DOL's administrative investigation, SIA reminded DOL that: (a) one of the above-referenced organizations that is similarly situated to SIA but that DOL recognizes as a "national" organization under the LMRDA is the Association of Professional Flight Attendants ("APFA"), which is the exclusive labor representative for all US-based Flight Attendants employed by American Airlines; (b) several years ago, DOL filed a lawsuit against APFA alleging that the organization had failed to comply with certain provisions of the LMRDA relating to the conduct of internal elections; (c) at all pertinent times, APFA and SIA were "similarly situated" to each other (as that term is used above); (d) at all pertinent times, APFA was a "national" labor organization; and (e) DOL's lawsuit asserted that APFA had violated certain LMRDA provisions or requirements applicable to "national" labor organization; and (f) DOL's lawsuit effectively acknowledged and accepted that APFA is appropriately categorized as a "national" labor

organization under the LMRDA (see *Perez [Acosta] v. APFA*, Civil Action No. 4:16-vc-1057-A (N.D.Tex.)); and APFA's LM-1 Form's and constitution on file at DOL's online "public disclosure room" continue to indicate, up to the present, that APFA is a "national" labor organization.

30. Furthermore, SIA expressed to DOL SIA's concern that, by accepting APFA as a "national" organization but not accepting SIA as a "national" labor organization, DOL was acting against SIA in an apparently arbitrary, capricious and discriminatory manner. DOL did not respond.

31. DOL's categorization of SIA as a "local" labor organization is erroneous and unlawful in itself. Moreover, in the context of the above-referenced "national" labor organizations that are similarly situated to SIA, DOL has singled out SIA for different and novel treatment. It has acted arbitrarily, capriciously, and unlawfully.

## FIRST CAUSE OF ACTION
**SIA as a National Labor Organization under the LMRDA**
**(Declaratory and Injunctive Relief under 28 U.S.C. §§ 2201–2202)**

32. SIA incorporates by reference all other paragraphs of this Counterclaim.

33. DOL divides labor organizations into multiple categories, including national and local. *See* 29 C.F.R. § 452.11.

34. The Labor-Management Reporting and Disclosure Act ("LMRDA") uses, but does not define, the terms "national" labor organization and "local" labor organization.

35. Whether a labor organization is "national" or "local" determines which provisions of the LMRDA apply to the organization.

36. SIA is a national labor organization under the LMRDA, and it operates on a nationwide basis under the RLA. DOL, while it appears to acknowledge that SIA operates

nationally, alleges that SIA is a "local" labor organization under the LMRDA. Thus, an actual controversy has arisen and now exists between SIA and the DOL concerning SIA's status as a national or local labor organization.

37. SIA seeks a judicial determination of its status as a national organization. Such a determination is necessary and appropriate at this time under the circumstances in order for the parties to determine which sections of the RLA apply to SIA.

38. The determination of whether SIA is a national or local labor organization will clarify the legal relationship between the parties, which is an issue which extends beyond this lawsuit, evidenced by additional lawsuits and investigations brought by the Secretary under the LMRDA.

39. Whether SIA is a national or local labor organization determines what rights SIA has under the LMRDA, including how it will conduct its future elections.

40. The DOL's position has led to confusion among SIA members, resulting at times in member grievances that are unfounded but must be addressed.

41. SIA seeks a declaration and order from the Court that SIA operates as and is, under the RLA and LMRDA, a national labor organization.

**SECOND CAUSE OF ACTION**
**Violation of APA**
**(5 U.S.C. § 706)**

42. SIA incorporates by reference all other paragraphs of this Counterclaim.

43. Under the Administrative Procedures Act ("APA"), a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory . . . authority or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

44. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

45. The LMRDA dictates the frequency and method of a labor organization's internal elections based on whether the labor organization is a "national" labor organization or a "local" labor organization. 29 U.S.C. § 481(a), (b).

46. The LMRDA does not define the terms "national" or "local" as they are used in the LMRDA or as they apply to labor organizations.

47. The DOL issued a regulation which provides that the "characterization of a particular organizational unit as . . . 'local,' 'intermediate,' . . . [or 'national], is determined by its functions and purposes rather than the formal title by which it is known or how it classifies itself." 29 C.F.R. § 452.11.

48. The DOL claims its characterization of SIA as a "local" labor organization is based on its regulation found at 29 C.F.R. § 452.11. However, the DOL has failed to apply the regulation appropriately and has effectively ignored certain pertinent and material terms.

49. Over the course of its underlying administrative investigation, DOL asserted a series of evolving and different bases for its characterization of SIA as a "local" labor organization, inconsistently applying 29 C.F.R. § 452.11. None of these bases referenced certain significant provisions of the LMRDA, the DOL's regulations and guidance, or the Railway Labor Act. The DOL avoided engaging with SIA in any meaningful discussion of the merits of SIA's position that it is a "national" labor organization.

50. The DOL treated SIA differently from other similarly situated organizations, has failed to follow its own internal guidance in its treatment of SIA, and has inconsistently applied its regulatory characterization of "national" and "local" to labor organizations, and in so doing the DOL has treated SIA unreasonably, arbitrarily and capriciously. In contrast, the DOL acknowledges and treats as "national" labor organizations numerous labor organizations to which SIA is similarly situated (*e.g.,* each is a unitary entity, having no parent organization, no affiliate, and no subordinate organization; each represents a nationwide workgroup of a single employer; each carries out not only what the DOL now says are ”local" functions but also what the DOL accepts as "national" functions).

51. The DOL has concluded that SIA is a local labor organization.

52. The DOL's position that SIA is a local labor organization under the LMRDA would require SIA to hold elections every three years and to conduct elections using a method and procedures not required of a national labor organization—all of which is at odds with SIA's Constitution and Bylaws and otherwise injures SIA and violates its rights, including but not limited to rights under the LMRDA and the Railway Labor Act.

53. The DOL's position has led to confusion among SIA members, resulting in member grievances that are unfounded but must be addressed.

54. SIA requests that the Court find Chavez-DeRemer and the DOL's actions unlawful, set aside the DOL's findings that SIA is a local labor organization, and declare that SIA is a national labor organization.

**PRAYER FOR RELIEF**

SIA prays that this Court:

1. On the First Cause of Action as set forth above, declare that SIA is a "national" labor organization under the LMRDA and enjoin DOL from categorizing and treating SIA as anything other than a "national" labor organization under the LMRDA;

2. On the Second Cause of Action, hold DOL and Chavez-DeRemer's actions unlawful under the APA, set aside the DOL's determination that SIA is a local labor organization, and declare that SIA is a national labor organization;

3. Award SIA its reasonable costs and attorneys' fees, to the extent permitted under applicable law; and

4. For such other and further relief as the Court deems just and appropriate under the circumstances.

DATED February 3, 2026.

/s/ Sarah Jenkins Dewey
Erik A. Christiansen
Christina M. Jepson
Sarah Jenkins Dewey
PARSONS BEHLE & LATIMER

Gregg M. Formella (*pro hac vice*)
GREGG M. FORMELLA, JD

*Attorneys for Defendant SkyWest InFlight Association*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2026, I caused a true and correct copy of the foregoing **ANSWER AND COUNTERCLAIMS** to be filed via the Court's CM/ECF system which automatically effectuated service on all parties of record appearing thereon.

/s/ Sarah Jenkins Dewey